## INGVALD G. WILSON v. CITY OF MONTEVIDEO.[1]

February 28, 1936.

No. 30,733.

[1]Reported in 265 N. W. 438.

*John C. Haave, Oscar S. Wilson,* and *Daly & Barnard,* for appellant.

*Guesmer, Carson & MacGregor,* for respondent.

Julius J. Olson, Justice.

Defendant appeals from an order denying its alternative motion for judgment notwithstanding or new trial. The amount of the verdict is not questioned.

The case has been tried twice, each trial resulting in a verdict for plaintiff. The issues involved are: (1) Whether actionable negligence on defendant's part is shown, and (2) if that be established, whether plaintiff's contributory negligence as a matter of law precludes recovery. The asserted contributory negligence includes (a) alleged failure on plaintiff's part to keep a proper lookout, and (b) excessive speed while driving his automobile at and immediately prior to the happening of the accident.

Plaintiff, manager of a store at Hazel Run, drove in his automobile to Montevideo on May 16, 1934, the purpose of his trip having to do with the store's business. Having finished his errand, he started back about 4:30 o'clock in the afternoon. On this trip he took as his route what is referred to in the evidence as the "gravel road." This road lies within the city limits and is under its control. It was formerly a part of what was known as the "Yellowstone Trail." Some two years prior to the happening of the accident trunk highway No. 212 was constructed somewhat to the west of the location of this road, and the principal traffic thereafter to the west from Montevideo followed the new paved trunk highway. But the graveled road was used to a very considerable extent by the traveling public and by residents of the city. Several families, residents of Montevideo, had their homes along its route. While the location was in the outskirts of the city and as such without side-

walks, there is no doubt that the road served useful purposes. There is no denial that the city as such is liable if actionable negligence is shown.

The road was laid across what is referred to as a dry run. In the center or lowest portion was a bridge with a span of some 60 feet. In the summer of 1934 the city concluded to tear out the bridge and to replace same with concrete culverts for drainage purposes. The work had so far progressed that only a very short space was left to fill.

Trucks were used to carry clay and earth into the space left by the taking out of the bridge. A short distance north of the northerly end of what was formerly the bridge these trucks turned in to the driveway of one of the residents and then backed down upon the grade, dumping the earth to the rear of the trucks, thus proceeding and thereby providing a center apparently in good shape for travel. Men shoveled the dirt from the center of the dump when thus placed in the road to either side, smoothing and leveling off the surface so as to harmonize it with the contour of the road north of it. The general color of the clay and dirt so hauled resembled in appearance the graveled surface of the road immediately north of the fill. One of the witnesses testified, respecting its general appearance, "Well, you wouldn't hardly—wouldn't know it was a bridge out until you drove right up to it." And further, "You couldn't exactly [observe the fill] until you got so close you would be awful close to the bridge." Immediately to the west of the old bridge site were a number of trees ranging in height from 20 to 40 feet. These trees threw "quite a little" shade over the bridge site when the sun got toward the west, "most of that bridge would be shaded there from the trees."

Plaintiff was traveling along at a rate of about 30 miles per hour. Shortly before he met with the mishap he observed that some construction work had been done. He kept his eyes on the traveled tracks in front of him and observed that there was no noticeable difference between the new fill and the regular traveled road over which he had come. He did not see the hole in front of him until he was so close that even by applying his brakes his car neverthe-

less slid into the opening, and as a result thereof he received certain injuries. He testified that although he was looking ahead he could see nothing at all dangerous until he was so close to the hole that it was too late to stop. He had no idea that there was danger ahead. The remaining portion to be filled and which was in process of being filled was a space sufficiently large so that there was "room for the car to fit right down in there, so it would be around about 12, 14 feet." The depth of the hole was three and one-half to four feet.

Before plaintiff came upon the scene, a guardrail taken from the old bridge and fastened to posts on either side, something like 20 feet apart, had been nailed across the traveled portion of the highway some distance north of the fill. This board or barrier rail had been taken down and placed along the edge of the graveled portion, thus leaving the road free from obstruction. There was nothing except the two posts to indicate that there might be something ahead indicating an unfinished job. There were no barricades, flags, or other warning signs. Defendant does not claim that there were. Its principal defense on this phase of the case is that the two men who were employed on the job, Nagel and Sorley, had warned plaintiff of the danger by yelling, shouting, and waving their arms. However, at least three witnesses testified that these men were not on the road nor upon the highway when the accident occurred. The jury did not believe their story. They are discredited witnesses. The issue was necessarily one of fact. Two witnesses besides plaintiff testified that it was difficult for one approaching from the direction plaintiff came to observe the hole.

From what we have stated it seems clear that a jury question was presented on both issues. In Ihlen v. Village of Edgerton, 140 Minn. 322, 168 N. W. 12, an automobile came in contact with a rope stretched across the traveled portion of a street, at a height of about five feet, on either side of a bandstand which had been erected for the purpose of a celebration then taking place. The questions of defendant's negligence and plaintiff's contributory negligence in that case were held properly submitted to a jury. It seems to us that a hole in this road, obscured as it was by shade of trees, could

well be considered by the jury as a dangerous situation, one requiring due diligence on defendant's part to erect and maintain adequate warning signs. As a general proposition, one improving a highway where there is public travel of any considerable amount takes such precautions. That the city in the instant case failed to take the precautions of the reasonably prudent person seems obvious. At least the jury could so find. The barrier rail that had been taken down and cast aside, although the posts were still there, might well lead one coming along the highway to believe that the repair work had been finished and that the road was open to use. The jury could well conclude that removing the barrier rail was really an invitation to any driver that everything ahead was reasonably safe. To take this case away from the jury obviously would have been improper. Two juries having passed upon the question, both resulting in verdicts for plaintiff, and the present verdict having the approval of the trial judge, we think there is no room for doubt but that the verdict rendered must stand.

There are numerous cases in this and other states in respect of what the duty of a municipality is in cases of this nature. It is not necessary to go into an extensive citation of authorities. After all, "The law makes some allowances for human frailties and hence uses the conduct of an ordinarily prudent person as a standard; and just what an ordinarily prudent person would do under the circumstances here involved must be solved by the composite judgment of the jury." Wicker v. North States Const. Co. Inc. 183 Minn. 79, 83, 84, 235 N. W. 630, 632. In that case, as in this, "the absence of flags or warning signs might have lulled him [the driver] into relaxing his vigilance. All the evidence and circumstances made the question of Mr. Wicker's contributory negligence a question for the jury." The following cases bearing upon this subject are instructive: City of Radford v. Calhoun, 165 Va. 24, 181 S. E. 345, 100 A. L. R. 1378, Anno. 1386; Franklin v. Kansas City (Mo. App.) 260 S. W. 502; Topeka Water Co. v. Whiting, 58 Kan. 639, 50 P. 877; Kloppenstein v. Union Traction Co. 109 Kan. 351, 198 P. 930; Martin v. J. A. Mercier Co. 255 Mich. 587, 238 N. W. 181, 78 A. L. R. 520; Dillabough v. Okanogan County, 105 Wash. 609, 178 P. 802.

Defendant has devoted considerable space in the brief to plaintiff's speed. It claims that under 1 Mason Minn. St. 1927, § 2720-4(a) and (7), plaintiff's speed being in excess of 20 miles per hour is *prima facie* evidence of negligence. Twenty miles an hour where the vehicle "passes through the residence portion of any municipality" is the particular language to which our attention is directed. But the statute does not say that such speed is negligence as a matter of law. It is only *prima facie* evidence of negligent conduct. The section through which this graveled road runs, and particularly at and adjoining the place where this bridge had been taken out, is only sparsely occupied. There were large gardens and fields of grain. There are no sidewalks and no intersecting streets. Along this highway are mailboxes to which residents go to get their mail. Everything points to the fact that this was, while within the city limits, virtually a farming or truck-gardening community. We do not think it can be said as a matter of law that the jury was wrong. The many witnesses testifying for both parties do not claim that there was anything noticeably dangerous respecting plaintiff's speed. He is an experienced automobile driver, a business man who over a period of time has handled and operated an automobile. Being a man of mature years and having such experience as is here disclosed, we think the evidence indicates rather forcefully that the entire situation was one for a jury to solve.

There are other assignments of error discussed by counsel. These have been examined and found to present nothing requiring discussion on our part.

Order affirmed.